UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| JASPER COLLINSON | : | Case No. 25-mj-261 |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its request that defendant Jasper COLLINSON be detained pending trial of this matter pursuant to 18 U.S.C. § 3142(f)(1)(A). COLLINSON is charged with Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2), (b)(1). Distribution of Child Pornography is a crime of violence, and there is no condition or combination of conditions that will reasonably assure the safety of children in the community – both in the physical world and online – if the defendant is released. As detailed below, an analysis of the factors set forth in 18 U.S.C. § 3142 leads to the conclusion that detention is the only way to protect children in the community and to ensure the defendant's future appearance.

**FACTUAL BACKGROUND**

Leading up to Tuesday, October 22, 2025, a Federal Bureau of Investigation (FBI) Washington Field Office (WFO) Task Force Officer (TFO) was acting in an undercover capacity (UC) as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. In that capacity, the UC entered a social media platform known to the UC as a place where people

1

meet to discuss various fetishes among other things. The application is a privacy-oriented, anonymous social media app for sharing, venting, and connecting in a less identity-driven way. It allows you to engage in communities, post and reply anonymously, choose connections nearby or globally, and focus more on content than persona.

While in this platform the undersigned posted the following message, "Any other and open minded tabu/kinky people here with few to no limits in the DMV looking for fun?" A user with a profile indicating that they were from Howard County, Maryland, initiated a private chat with the undersigned. This person was subsequently identified as JASPER COLLINSON ("COLLINSON" or "Defendant").

During the course of the chat the UC asked COLLINSON, "what kinna naughty things u into." COLLINSON responded, "All sorts of stuff. The kinkier the better. Roleplay, bondage, piss, CNC, and lots of other stuff too, too much to list."

During the course of the chat the UC provided his KIK account screen name and began communicating with COLLINSON on KIK private messenger. COLLINSON used the screen name, "robotmobot" with a display name of, "Jazz the pup." COLLINSON used a dog emoji as the profile picture with a smaller emoji of a slice of pizza attached. Based on your affiant's training and experience, a pizza emoji is often used by individuals that have an interest in child pornography.

During the course of the chat the UC asked COLLINSON, "So what's the naughtiest thing you have done." COLLINSON responded, "I've done so much.... Used to have a friend whod make me do coke or tina and then watch CP as we messed around." Your affiant knows from experience that CP is short for child pornography.

During the course of the chat the UC informed COLLINSON that he was sexually active

with his purported 6-year-old daughter. The following is a portion of the chat:

> Collinson: So you actually done anything or just watched vids.
>
> UC: Both, I dont play with the 12 but i do with the 6. She jerks, sucks, and I lick her pussy and ass and cum on her. She is really cool and safe. I would never trust the 12, she is more like a step anyway and hasn't been around lately.
>
> Collinson: That's so hot
>
> UC: Omg I cum soooo much.
>
> Collinson: My current stance is, I'm not gonna actively seek it out, but if the opportunity presented itself, I don't think I could resist the temptation.

During the course of the chat the UC provided his cell number to COLLINSON and COLLINSON in turn texted the UC using the number, 443-XXX-0610.

During the course of the chat COLLINSON described a situation involving two friends who were recently investigated by law enforcement. The following is a portion of that chat:

> Collinson: I just have so much fear over getting caught. I've got two friends in prison over this stuff. And yet I keep coming back to it. Guilty pleasures and inability to resist temptation.
>
> UC: Lol, omg how they get caught.
>
> Collinson: Well one tried to convince a couple of teens to sleep with him in exchange for booze, the girls took the booze and ran and told the cops on him.
>
> UC: What bitches, that's fucked up.
>
> Collinson: Yeah. The other one, I'm not 100 percent sure, but it seems like his IP was traced or something, just wasnt being careful enough when browsing. That one was much more recent.
>
> UC: Ah that blows.
>
> Collinson: I was with him when they came. They searched my phone. Its a miracle they didn't find anything. I had basically resigned myself to getting caught with him, but

3

somehow they let me walk. The fear from that experience should've scared me off this stuff for good, but here I am, less than two weeks later.

UC: Omg, thats terrifying lol, Do you think he had shit on his phone.

Collinson: Idk, we didnt really talk about it much. We both knew the other was into it but we had other kinks we focused on.

UC: Ah ok cool, well thankfully it all worked out.

Collinson: I miss him though.

UC: I bet.

Collinson: Never involved her but his autistic daughter was around when we fucked, was kinda hot when she watched, but mostly she was just doing her own thing while we did ours. Idk if he did anything with her that I didn't know about.

UC: Thats still hot as fuck! How old is she

Collinson: Not sure like 6-8 range.

UC: Nice!

Collinson: Crazy cute, but I never could've done anything with her without asking him, and I was to scared to ask him.

On October 8, 2025, the UC investigated a distribution of CSAM case involving a Suspect. Baltimore FBI executed a search warrant at this residence and located a second individual located in the residence along with the Suspect. The UC was able to confirm the identity of this individual as JASPER COLLINSON, DOB: 5/XX/19XX. The UC also verified with the Baltimore FBI that they did conduct a cursory search of COLLINSON's phone and returned the phone back to COLLINSON. The Baltimore FBI also confirmed that an autistic female child of the Suspect was present in the home.

During the course of the chat COLLINSON provided a Telegram account name, "@fernfox422" and began a private messenger conversation on October 28, 2025.

4

UC: Hey Jon from kik

Collinson: Hey

UC: This is safer for sure

Collinson: Agreed.  So, a lil sneak of my stash.

UC: Yes! I would love that.

COLLINSON then sent the UC the following six videos:

a. A video of a young female who appears to be prepubescent or low teens sucking on an adult penis. The video is 11 seconds in length.

b. A video of a young teen female in a bathroom removing her clothes. The young teen masturbates her vagina with her fingers. The video is five minutes and 44 seconds in length.

c. A video depicting a young teen female have vaginal intercourse with an adult male. The video is 10 seconds in length.

d. A video depicting a prepubescent female being anally penetrated by an adult male penis. The video is 14 seconds in length.

e. A video depicting a young pubescent teen having vaginal intercourse with an adult male. The video is 1 minute and 37 seconds in length.

f. A video depicting a young pubescent teen having vaginal intercourse with an adult male. The video is 34 seconds in length.

The UC asked COLLINSON, "are those the most hardcore you have." COLLINSON responded, "No, just the most recent. I don't have them stored any particular way, so I just grabbed what was last posted in the channel I keep them in."

Later in the chat, COLLINSON informed the UC that COLLINSON is currently in a private group on Telegram but unable to invite anyone to the group.

On October 29, 2025, after the UC asked whether COLLINSON had "Any good post from the private group," COLLINSON sent the UC three additional videos via Telegram. The videos depict the following:

a. A video that depicts an adult male having vaginal intercourse with a prepubescent female. The video is one minute and 31 seconds in length.

b. A video depicting an adult male pressing his penis on the vagina of a toddler child. A woman's hands are seen spreading the child's vagina. The video is 10 seconds in length.

c. A video of two men groping and having vaginal sex with a toddler aged child. The video is 27 seconds in length.

During the course of the chat COLLINSON stated that COLLINSON met a male online that resided in DC who was supposed to introduce COLLINSON to a 17-year-old male for the purpose of sex. COLLINSON stated that the meet never happened due to the 17-year-old being grounded by his parents.

COLLINSON agreed to meet the UC on November 5, 2025, at a prearranged location in Washington, DC for the purpose of engaging in a sexual encounter with the UC. COLLINSON informed that UC that COLLINSON would be wearing a blue hoodie and black cargo pants. COLLINSON arrived at the prearranged location wearing the aforementioned attire. The UC made eye contact with COLLINSON and said, "Hey Jazz," a name used by COLLINSON in previous

6

chats. COLLINSON acknowledged the UC stating, "hi" and sat next to the UC at the bar. On November 5, 2025, COLLINSON was arrested without incident and transported to the WFO FBI for processing. COLLINSON possessed a valid Maryland Driver's license bearing the name, JASPER COLLINSON and Date of Birth of May XX, 19XX.

## PROCEDURAL HISTORY

The defendant was arrested on November 5, 2025, and made an initial appearance before the United States District Court for the District of Columbia on November 6, 2025. On the government's motion, the defendant was held pending a detention hearing, which is scheduled for November 10, 2025. The government now respectfully submits this memorandum in support of its motion for pretrial detention.

## APPLICABLE LEGAL STANDARD

The defendant is charged with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), a crime of violence. 18 U.S.C. § 3156(c) defines a "crime of violence" to include violations of Title 110, under which § 2252(a)(2) falls. Further, § 2252(a)(2) gives rise to a rebuttable presumption of detention pursuant to 18 U.S.C. § 3142(e)(3)(E), where it is to be *presumed* that no combination of conditions will protect the community or assure the defendant's return. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"); *see also United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008). Even if the defendant does not pose a flight risk,

7

danger to the community by itself is a sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## **ANALYSIS**

COLLINSON poses a significant danger to children in the community – including children who are being preyed on over the internet as well as children in the physical world – and there are no conditions short of detention that will protect children from the defendant's predation. For the

reasons addressed below, the factors outline in 18 U.S.C. § 3142(g) weigh in favor of detention and COLLINSON cannot rebut the presumption of detention.

A. **Nature and Circumstances of the Charged Offense**

COLLINSON's conduct in this case poses a risk to children in the physical and online world. COLLINSON distributed directly to the UC nine videos including CSAM, many including prepubescent victims and at least two featuring the rape of toddler children. Further, COLLINSON openly acknowledged participation in a group on telegram that was actively dedicated to the dissemination of CSAM materials. COLLINSON's distribution of CSAM is in the context of aspirational and actual abuse of children in real life, including COLLINSON's acknowledgement in the conversation with the UC that COLLINSON would have sexual intercourse with a friend in front of that friend's autistic child, who was between 6 and 8 years old and that COLLINSON found it "kinda hot when she [referencing the autistic child] watched." COLLINSON described the child as "crazy cute" and stated that "I never could've done anything with her without asking him [her friend]." COLLINSON also told the UC while referencing the UC's purported abuse of the UC's 6 year old child that "I'm not gonna actively seek it out, but if the opportunity presented itself, I don't think I could resist the temptation." However, later in the conversation, COLLINSON acknowledged an effort to meet up with a 17 year old that didn't work out because, according to COLLINSON, he was grounded on the day they were supposed to meet up for sexual intercourse.

As Chief Judge Boasberg noted in considering the government's appeal of the magistrate court's release order in *United States v. Reid*, 25-cr-311 (JEB), it is important to consider where the defendant's behavior falls on the spectrum of conduct commonly seen in child exploitation cases. At one end of the spectrum are individuals who distribute a single image of child pornography. At the other end are defendants who are engaging in hands-on abuse of a child or

running forums dedicated to trading child pornography. The government would submit that COLLINSON's conduct falls more towards the higher end of that spectrum. COLLINSON not only distributed numerous CSAM files to the UC, but was also engaging in various other CSAM distribution spaces, including an online telegram distribution group and, as COLLINSON acknowledged to the UC during their conversation, meeting in person with people to engage in illicit drug use while watching child pornography. COLLINSON has also made affirmative steps outside of the online activity, including engaging in sexual intercourse in front of a friend's 6–8-year-old autistic daughter and finding it "kinda hot" when she [the autistic child] watched; acknowledging that, if given the opportunity, COLLINSON would engage in hands on abuse; and disclosing to the UC that COLLINSON in fact made an effort to meet up with a 17 year old for sexual intercourse which only didn't happen because the 17 year old found himself grounded according to COLLINSON.

COLLINSON's conduct demonstrates that COLLINSON poses a danger both to children in the physical world, as well as to children who are suffering the aftermath of having images of their sexual abuse distributed online. On a broad level, children depicted in sexually explicit images and videos are victimized at the time the images were created, and they are re-victimized each time an individual, like the defendant, views the images for their own sexual gratification. As explained by the Sixth Circuit in a child pornography case:

> ...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.

> ...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011) (quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Indeed, Congress has recognized the serious nature of crimes involving child pornography and the long-term damage that these crimes can cause, by specifying that these crimes carry a rebuttable presumption of detention. § 3142(e)(3)(E), and, in the case of distribution of CSAM, a five-year mandatory minimum sentence. 18 USC § 2252(b)(1). COLLINSON is alleged to have distributed numerous videos of child pornography in the context of a conversation with a UC. In these circumstances, there is no combination of conditions that will protect children both online and in the physical world from the danger posed by the defendant and the Court should detain COLLINSON pending trial. This factor weighs heavily in favor of detention.

    **B.**    **The Weight of the Evidence Against the Defendant**

The weight of the evidence against the defendant is very strong and also weighs heavily in favor of detention. The government is in possession of the chats between COLLINSON and the UC, which are the evidence of the defendant's criminal conduct. Specifically, the defendant distributed via chat conversation to the UC nine separate videos containing CSAM, a majority of which were prepubescent children and two of which appear to depict toddlers being raped by adults. It is not questionable whether the files sent by COLLINSON qualify as CSAM—these files clearly depict the sexual abuse of young children. Further, COLLINSON showed up at the

pre-arranged location where the UC and COLLINSON agreed to meet. COLLINSON was wearing the clothing that was previously communicated to the UC and responded affirmatively to the UC when meeting with the UC at the prearranged location.

pre-arranged location where the UC and COLLINSON agreed to meet. COLLINSON was wearing the clothing that was previously communicated to the UC and responded affirmatively to the UC when meeting with the UC at the prearranged location.

A district court must consider the weight of the evidence when assessing whether the defendant is a danger or poses a risk of flight and has broad discretion to determine the relative weight of each of the four Bail Reform Act factors. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *9 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) ("First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors."). No factor is categorically of greater or lesser weight than the others. As the Second Circuit Court of Appeals observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant. *See generally* 18 U.S.C. § 3142(g). That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). In *Zhang*, the Second Circuit found that the district court gave appropriate weight to the second factor – the weight of the evidence – in determining that there was "significant evidence" that Zhang had in fact committed the charged murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness if released into the community, common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence, especially coupled with the nature of the charged offense. It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail.

*Id.* Similarly, in considering whether the defendant poses a risk of flight, the court explained that where "the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." *Id.* at 151-52.

The *Zhang* court's analysis has been cited approvingly in the District Court of the District of Columbia in *Blackson*, and its analysis holds true here as well. *Blackson,* 2023 WL 1778194, at *9-10. The evidence against COLLINSON is strong, suggesting both a heightened danger to the community as well as an elevated risk of flight. The strength of the evidence heavily supports detention in this case, as it indicates the significant risk of danger posed by the defendant.

### C. History and Characteristics of the Defendant

While the defendant does not have any criminal history, there is reason to believe that the defendant has engaged in criminal conduct prior to the conduct in this case. The government's evidence shows that the defendant was communicating with multiple people regarding the sexual abuse of children and exchanging CSAM, including the defendant's admission to involvement in a group on telegram where individuals were distributing CSAM, the defendant's admission to meeting with other individuals to engage in illicit drug use while watching CSAM together, the defendant's admission to engaging in sexual intercourse in front of a 6-8 year old autistic child, and other actions by the defendant. The defendant's desire to seek out a community of like-minded individuals who are interested in the sexual abuse of children demonstrates that COLLINSON's conduct in this case was not one instance of poor decision making. The brazenness with which COLLINSON distributed CSAM to a relatively new association, the UC, demonstrates COLLINSON's comfort in doing so and likely experience in collecting and distributing CSAM.

Particularly relevant to the ability to COLLINSON's ability to refrain from this illegal conduct is COLLINSON's own admission that demonstrates COLLINSON's unwillingness or inability to refrain from engaging in distribution of CSAM or other similar criminal conduct. Specifically, COLLINSON told the UC about her same friend with the autistic child and that that friend was arrested by police just two weeks prior. COLLINSON says, "I was with him when they came. They searched my phone. Its a miracle they didn't find anything. I had basically resigned myself to getting caught with him, but somehow they let me walk. The fear from that experience should've scared me off this stuff for good, but here I am, less than two weeks later." COLLINSON's own admissions further support that there are no conditions or combination of conditions that could keep the community safe.

This evidence shows that the defendant's lack of criminal history does not accurately portray the history of criminal conduct. Thus, the defendant's history and characteristics weigh in favor of detention.

### D.   The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the sexual exploitation of children presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like the defendant and others with a demonstrated sexual interest in children. It is this type of harm that led Congress to create the statutory presumption of detention in these cases and to provide for a mandatory minimum sentence if convicted.

That child pornography offenses are serious is a fact noted by the Supreme Court. At least as early as the landmark decision, *New York v. Ferber*, 458 U.S. 747 (1982), the Supreme Court referenced numerous research materials detailing the harm to children as a result of the production and trafficking of child pornography.

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."

Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981). *See also* Child Exploitation 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U.Mich.J. Law Reform 295, 301(1979)(interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). 4 58 U.S. 758, n.9.

> Moreover, as the Eastern District of New York has found:
>
> ...the issue is not only defendant's potential abuse of children and his interaction with children if on bail, but also his ability, if he is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.

*United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006). The *Reiner* court further found that there were no conditions in that case that could reasonably assure the safety of the community "[i]n this day and age, with devices such as cellphones, Blackberries, and laptops..." *Id.* at 399; *see also United States v. Blankenship*, 2008 WL 1925137 (S.D.W.Va. April 29, 2008) (unpublished) (noting the ease of accessing the internet by means of various devices and stating "[t]he Court finds that the evidence clearly and convincingly establishes that, confined to his home and electronically monitored, defendant would not be prevented from obtaining the means to access the internet and attempting again to obtain child pornography and in this poses a danger to

children and the community"); *United States v. Doyle,* 2007 WL 1097844, *1 (W.D.Va. 2007)(finding danger of future offenses "especially considering that pornographic images of children are widely available on the internet and can be easily accessed by a personal computer"), conviction rev'd on other grounds, 650 F.3d 460 (2011). The risk the defendant poses to children in the community is significant and weighs heavily in favor of detention.

At this time, we have no information regarding a third-party custodian for the defendant. However, the defendant in this case took steps to use encrypted messaging applications, which shows that the defendant has the ability to use deceit to hide criminal conduct.

## CONCLUSION

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the defendant should be detained pending trial.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:    */s/ Richard Kelley*
Richard Kelley
DC Bar No. 1026390
Assistant United States Attorney
601 D St NW
Washington, DC 20530
(202) 834-3571
richard.kelley2@usdoj.gov